UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PT RAHAJASA MEDIA INTERNET,

                Petitioner,

- against -

TELECOMMUNICATION AND INFORMATICS FINANCING PROVIDER AND MANAGEMENT CENTRE, DIRECTORATE GENERAL OF POST AND INFORMATION ADMINISTRATION, MINISTRY OF COMMUNICATION AND INFORMATION, REPUBLIC OF INDONESIA,

                Respondent.

**ORDER**

20 Civ. 11035 (PGG) (OTW)

---

PAUL G. GARDEPHE, U.S.D.J.:

        On December 30, 2020, Petitioner PT Rahajasa Media Internet filed a petition to confirm a foreign arbitration award against Respondent Telecommunication and Informatics Financing Provider and Management Centre, which is an agency of the Republic of Indonesia (the "Petition").[1]  (Pet. (Dkt. No. 1) ¶¶ 1-2)  Petitioner has amended the Petition twice; the Second Amended Petition ("SAP") is currently the operative petition.  (SAP (Dkt. No. 18); Apr. 14, 2021 Order (Dkt. No. 13) (granting leave to file SAP))

        In an August 17, 2021 order, this Court referred the case to Magistrate Judge Ona T. Wang for general pretrial supervision.  (Order of Referral (Dkt. No. 38))  In an August 24, 2021 order, Judge Wang directed Petitioner's counsel "to show cause . . . why [she] should not recommend that this case be dismissed as time-barred," given the time that passed between the

---

[1] The Petition refers to Respondent by its position within the Indonesian government.  (Pet. (Dkt. No. 1) ¶ 2)

2017 foreign arbitration award Petitioner seeks to confirm and the initiation of this action on December 30, 2020. (Show Cause Order (Dkt. No. 39) at 2)[2] In October 24, 2021 submissions, Petitioner's counsel argues that the applicable statute of limitations was tolled pursuant to the doctrine of equitable tolling. (McAllister Decl. (Dkt. No. 47) ¶ 3; Butler Ltr. (Dkt. No. 48) at 1)

For the reasons stated below, this Court finds that equitable tolling does not apply. Accordingly, this action will be dismissed as time-barred.

## BACKGROUND

**I.   FACTS**

Petitioner is an Indonesian internet service provider. (SAP (Dkt. No. 18) ¶ 1) Respondent is an Indonesian government agency that, among other things, "contracts with private companies for telecommunication service projects." (Id. ¶ 2)

Between November 2010 and December 2011, Petitioner successfully bid on five government-sponsored internet service projects organized by Respondent. (Id. ¶ 10) The parties "signed . . . [five] commercial agreements" in which Petitioner agreed to provide internet access in various regions in Indonesia. (Id. ¶ 9) Respondent agreed to pay Petitioner the equivalent of $22,375,349.07 for its work on these five projects. (Id. ¶¶ 11)

Petitioner completed "the pre-operational stage" and "began the operational stage" of the first of these government contracts, and then "carried out the pre-operational stage requirements" for the remaining four government contracts. (Id. ¶¶ 14-15) To finance its work on the projects, Petitioner secured a loan from PT Bank Pembangunan Daerah Jawa Barat dan Banten ("Bank BJB"). (Id. ¶ 13)

---

[2] Citations to page numbers of docketed materials correspond to the pagination generated by this District's Electronic Case Files ("ECF") system.

On February 12, 2014, Respondent informed Petitioner that it would be "postpon[ing] . . . payment for [Petitioner's] work performed, until the Indonesian Parliament issued a budget approval that allowed for such payment." (Id. ¶ 16)  The budget was never approved, and in a series of letters sent between March 3, 2015 and January 6, 2016, Respondent expressed "the intent to no longer carry out any obligations to [Petitioner]" under the parties' agreements. (Id. ¶ 17)  Between August 2016 and February 2017, the parties engaged in negotiations to determine the amount owed to Petitioner for its work under the government contracts, but these negotiations were unsuccessful. (Id. ¶¶ 18-20)

Accordingly, in early 2017, the parties proceeded to arbitration before a tribunal organized through the Indonesian National Board of Arbitration (the "BANI Tribunal"). (Id. ¶ 21)  On July 27, 2017, the BANI Tribunal found Respondent in default as to all five of the parties' agreements and awarded Petitioner the equivalent of $16,948,937.28 (the "Award").[3] (Id. ¶ 23)

Pursuant to Indonesian arbitration law, on August 15, 2017, Petitioner registered the Award at the South Jakarta District Court. (Id. ¶ 24)  Respondent did not appeal the Award or otherwise apply to set aside the award within the requisite time period. (Id.)  Accordingly, "[i]n September 2017, the Award became final and binding." (Id.)

To date, Respondent has not paid Petitioner the amount owed under the Award. (Id. ¶¶ 25, 27)  On March 26, 2018, Petitioner "made a formal application for an order of execution, on the Award, at the South Jakarta District Court." (Id. ¶ 25)  The South Jakarta District Court has not ruled on Petitioner's application. (Id.)

---

[3] The Tribunal also directed each side to pay half of the costs of the arbitration. (Id.)

In 2019, after Petitioner defaulted on the loans it had taken out to finance its work on the government projects, Bank BJB initiated involuntary bankruptcy proceedings against Petitioner.  (Id. ¶ 26)  On November 27, 2019, certain of Petitioner's assets were sold in an auction conducted by Bank BJB.  (Id.)  Petitioner contests the legitimacy of that auction, and litigation regarding the auction is ongoing.  (Id. ¶ 27)

## II.     PROCEDURAL HISTORY

On December 30, 2020, Petitioner commenced this action, seeking to confirm and enforce the Award against Respondent under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 – commonly referred to as the "New York Convention."  (Pet. (Dkt. No. 1) ¶¶ 4, 29-32)  The Petition asserts that venue is appropriate in this District because certain "financial institutions owned and operated by Respondent, within this District, give rise to the District's personal jurisdiction over Respondent."  (Id. ¶ 7)

Shortly after filing the Petition – and before this action was assigned to this Court – Petitioner filed an Amended Petition.  (Am. Pet. (Dkt. No. 4))  On April 11, 2021, Petitioner sought leave to file a second amended petition that would, inter alia, add additional detail regarding "the extent to which Respondent does business in the Southern District of New York."  (Pet. Apr. 11, 2021 Ltr. (Dkt. No. 12) at 1)  This Court granted Petitioner's request (Apr. 14, 2021 Order (Dkt. No. 13)), and on May 5, 2021, Petitioner filed the SAP.  (SAP (Dkt. No. 18))  The SAP asserts that "Respondent is an agency of the Republic of Indonesia and the Republic of Indonesia has property located in this district, namely funds located in three separate banks operated by the Republic of Indonesia . . . in Manhattan."  (Id. at ¶ 6)

4

On August 17, 2021, this Court referred this action to Judge Wang for general pretrial supervision.  (Order of Referral (Dkt. No. 38))  In an August 24, 2021 order, Judge Wang notes that "the arbitration award sought to be confirmed in this action was made on July 27, 2017, nearly three-and-a-half years before the start of [this] action."  (Show Cause Order (Dkt. No. 39) at 1)  She also points out that "9 U.S.C. § 207 imposes a three-year statute of limitations on petitions seeking confirmation of arbitral awards subject to the New York Convention."  Accordingly, Judge Wang ordered Petitioner's counsel to "show cause, in writing . . . , why [she] should not recommend that this case be dismissed as time-barred."  (Id. at 1-2)

On October 24, 2021, Petitioner's attorneys filed responses to Judge Wang's order.  (McAllister Decl. (Dkt. No. 47); Butler Ltr. (Dkt. No. 48))  John McAllister states in his declaration that, "pursuant to 9 U.S.C. § 207, Petitioner had until July 27, 2020, to timely file [a] petition to confirm the Award in this Court, whereas the [P]etition was filed December 30, 2020."  (McAllister Decl. (Dkt. No. 47) ¶ 2)  McAllister argues, however, that "[t]his limitation should be equitably tolled under the unique and extraordinary circumstances" of this case.  (Id. ¶ 3)

According to McAllister, "Petitioner has been doing everything it can for years in Indonesia to enforce the Award, but has been repeatedly foiled by multiple instrumentalities of the Indonesian government, of which both Respondent and the Indonesian courts involved here are part."  (Id. ¶ 5)  McAllister further represents that, under Indonesian arbitration law, the South Jakarta District Court was required to issue an "order of execution [on the Award] within 30 days of [an] application."  (Id. ¶ 7)  Although Petitioner made such an application, the South Jakarta District Court has never issued an order of execution.  (Id.)  McAllister also states that "Petitioner repeatedly brought the arbitral award to the attention of the government agency

5

responsible for paying it, and was told repeatedly that payment would soon be forthcoming and not to worry." (Id. ¶ 8)

According to McAllister, Petitioner's involuntary bankruptcy has "crippled" "Petitioner's ability to conduct business in Indonesia or elsewhere." (Id. ¶ 9) "The bankruptcy proceeding remains unsettled as the Petitioner continues to challenge legal irregularities and conflicts of interest that threaten its remaining assets." (Id.) According to McCallister, the "irregularities" in the bankruptcy proceedings, the delay that Petitioner has experienced in Indonesian courts, and Petitioner's inability to collect on the Award from Indonesian officials "reflects collusion among different entities of the Indonesian government, of which Respondent is one." (Id. ¶ 11)

McAllister further explains that the COVID-19 pandemic has impeded Petitioner's efforts to enforce the Award. Indonesian courts "were ordered to transition to virtual proceedings." Accordingly, "Petitioner['s counsel] could not appear in person at the courthouse to question the court's inaction on [its] request for an order of execution." (Id. ¶ 10) And "[w]hen [COVID-19] restrictions eased in 2021, [a representative of] Petitioner appeared at the courthouse and was told [that Petitioner's] application was in a queue." (Id. ¶ 10 n.3)

Finally, McAllister states that on July 2, 2020, "Indonesian police arrested and detained Roy Yamin[, Petitioner's Director,] . . . resulting in his eviction and [the] seizure of critical personal and business documents." (Id. ¶ 10)

Bridget Butler – who also serves as Petitioner's counsel – repeats the points set forth in McAllister's declaration in a letter submitted to Judge Wang. (See Butler Ltr. (Dkt. No. 48)) Butler acknowledges that the applicable statute of limitations expired before this action was commenced, but she argues that Petitioner's "reasonable diligence despite the extraordinary

circumstances it faced in Indonesia . . . merit[s] an equitable tolling of the 3-year statute of limitations." (Id. at 1)  Butler likewise alleges collusion among various Indonesian government entities in (1) delaying action on Petitioner's application for an order of execution; and (2) commencing involuntary bankruptcy proceedings against Petitioner.  (Id. at 2)  Butler claims that "Petitioner was . . . overwhelmed with multiple litigations relating to the involuntary bankruptcy . . . [t]hat all would have been avoided if the [South Jakarta] District Court had granted Petitioner the execution order and Respondent had actually paid the Award." (Id.)  Butler further argues that "[a]ll of this was unforeseeable and outside of [Petitioner's] control, resulting in a perfect storm which overwhelmed its limited resources." (Id.)  "In keeping with equity and justice, this Court should . . . grant . . . equitable tolling since Petitioner was delayed in seeking the Court's assistance due to collusive acts of" Indonesian state actors.  (Id. at 3)

Judge Wang has not addressed the timeliness of the Petition since receiving counsel's submissions.  Accordingly, this Court will address the statute of limitations issue sua sponte.  See Walters v. Indus. & Comm. Bank of China, 651 F.3d 280, 293 (2d Cir. 2011) ("[A]lthough the statute of limitations is ordinarily 'an affirmative defense that the defendant must raise at the pleadings stage and that is subject to rules of forfeiture and waiver,' . . . district courts may dismiss an action sua sponte on limitations grounds in certain circumstances where 'the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted.'" (quoting John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 133 (2008); Leonhard v. United States, 633 F.2d 599, 609 n.11 (2d Cir. 1980))).

# DISCUSSION

## I. APPLICABLE LAW

"[T]he New York Convention applies to arbitral awards made in a foreign country that a party seeks to enforce in the United States." CBF Indústria de Gusa S/A v. AMCI Holdings, Inc., 850 F.3d 58, 70 (2d Cir. 2017) (quotation marks omitted). The obligations of the United States under the New York Convention are codified in Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 et seq. See id. at 71.

9 U.S.C. § 207 provides that, "[w]ithin three years after an arbitral award falling under the [New York] Convention is made, any party to the arbitration may apply to [a U.S. district court] for an order confirming the award as against any other party to the arbitration." 9 U.S.C. § 207; see also id. § 203 (providing that "[t]he district courts of the United States . . . shall have original jurisdiction over" "[a]n action or proceeding falling under the [New York] Convention . . . regardless of the amount in controversy"). The Second Circuit has construed Section 207 as imposing a mandatory three-year statute of limitations on actions to enforce foreign arbitration awards, which begins to run on the date of the arbitrators' decision. See Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 989 F.2d 572, 580-81 (2d Cir. 1993); Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152, 158 n.6 (2d Cir. 2003) ("[I]n holding that a petition filed beyond the Convention's three-year limitations period was time barred, the Seetransport court necessarily, if implicitly, held the limitations period to be mandatory.").

Under the doctrine of equitable tolling, courts may toll an applicable statute of limitations in certain circumstances. See Menominee Indian Tribe v. United States, 577 U.S. 250, 255 (2016). "[A] litigant is entitled to equitable tolling of a statute of limitations only if the

8

litigant establishes two elements: '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing.'" Id. at 255 (quoting Holland v. Florida, 560 U.S. 631, 649 (2010)).

With respect to the first element, "the party seeking equitable tolling must have acted with reasonable diligence throughout the period he seeks to toll." Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000).

As to the second element, "[t]he term 'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." Harper v. Ercole, 648 F.3d 132, 137 (2d Cir. 2011). Moreover, "[t]o show that extraordinary circumstances prevented . . . filing . . . on time, [a litigant] must demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing." Hizbullahankhamon v. Walker, 255 F.3d 65, 75 (2d Cir. 2001) (quotation marks and citation omitted). "Hence, if the person seeking equitable tolling has not exercised reasonable diligence in attempting to file after the extraordinary circumstances began, the link of causation between the extraordinary circumstances and the failure to file is broken, and the extraordinary circumstances therefore did not prevent timely filing." Id. (quotation marks, citation, and alterations omitted) (emphasis in original).

"Because statutes of limitations protect important social interests in certainty, accuracy, and repose, equitable tolling is considered a drastic remedy applicable only in rare and exceptional circumstances." A.Q.C. ex rel. Castillo v. United States, 656 F.3d 135, 144 (2d Cir. 2011) (internal citations, quotation marks, and alterations omitted). And the Second Circuit has "set a high bar to deem circumstances sufficiently 'extraordinary' to warrant equitable tolling." Dillon v. Conway, 642 F.3d 358, 363 (2d Cir. 2011).

## II.   ANALYSIS

Petitioner concedes that the three-year statute of limitations for initiating this action to enforce the Award had fully run by July 27, 2020, more than five months before this action was commenced on December 30, 2020. (See McAllister Decl. (Dkt. No. 47) ¶ 2; Butler Ltr. (Dkt. No. 48) at 1) Accordingly, this action was not timely brought. The only remaining issue is whether the untimeliness of this action should be excused pursuant to the equitable tolling doctrine.[4] The Court concludes that Petitioner has not shown that it was reasonably diligent in pursuing its rights or that extraordinary circumstances prevented it from filing the Petition in a timely manner.[5]

As to diligence, Petitioner states that it registered the July 27, 2017 Award in South Jakarta District Court on August 15, 2017, and that the Award became "final and binding" in September 2017. (SAP (Dkt. No. 18) ¶¶ 23-24) On March 26, 2018, Petitioner applied to the South Jakarta District Court for an order of execution. (Id. ¶ 25) Why Petitioner permitted six months to pass before seeking the order of execution is not explained. In any event, according to

---

[4] Although the Second Circuit has not addressed the applicability of equitable tolling to 9 U.S.C. § 207, other courts have applied equitable tolling to petitions seeking confirmation of foreign arbitral awards under Section 207. See BCB Holdings Ltd. v. Gov't of Belize, 110 F. Supp. 3d 233, 245 (D.D.C. 2015), aff'd 650 F. App'x 17 (D.C. Cir. 2016); Everplay Installation Inc. v. Guindon, No. 08-cv-824 (PAB) (CBS), 2009 WL 4693884, at *5 (D. Colo. Dec. 2, 2009); see also EGI-VSR, LLC v. Huber, 19 Civ. 6099 (ER), 2020 WL 1489790, at *12 n.12 (S.D.N.Y. Mar. 27, 2020) (assuming that equitable tolling could apply to three-year statute of limitations imposed by Section 207, but declining to toll the statute of limitations in that case).

[5] Petitioner does not address how the Foreign Sovereign Immunities Act ("FSIA") impacts this Court's jurisdiction to hear this action, given that Respondent is an "agency or instrumentality of a foreign state" that is presumptively entitled to sovereign immunity under the FSIA. 28 U.S.C. § 1603(b). The Second Circuit has held, however, that actions brought under the New York Convention may proceed against the agent or instrumentality of a nation that is a signatory to the New York Convention under the "waiver exception" to the FSIA. See Seetransport, 989 F.2d at 578-79. Because the Republic of Indonesia is a signatory to the New York Convention (see Pet. (Dkt. No. 18) ¶ 5), under Seetransport, this Court has jurisdiction over the Indonesian government agency that is the named respondent.

Petitioner's counsel, the South Jakarta District Court was required to issue the order of execution within thirty days but did not do so. (McAllister Decl. (Dkt. No. 47) ¶ 7)

The record offers only vague and conclusory statements about the efforts Petitioner made to obtain the order of execution once the thirty-day period had passed. For example, Petitioner's Director – Roy Yamin – states in his declaration that he "made formal requests on the application, in the past three years" (Yamin Decl. (Dkt. No. 27) ¶ 11), and Petitioner's counsel asserts that Petitioner "returned to the District Court, multiple times, over the years, to check on the status of the request." (Butler Ltr. (Dkt. No. 48) at 2) But Petitioner does not state when "over the years" it sought the order of execution, or precisely what happened when this request was made.

Petitioner also asserts that the COVID-19 pandemic prevented Petitioner's representatives from "appear[ing] in person at the courthouse to question the court's inaction on [its] request for an order of execution." (McAllister Decl. (Dkt. No. 47) ¶ 10) But the Award became "final and binding" in September 2017 (SAP (Dkt. No. 18) ¶ 24), and the pandemic did not arrive until first quarter 2020. Accordingly, years passed in which the pandemic presented no obstacle to appearing in court. And while the pandemic forced Indonesian courts – in 2020 – to "transition to virtual proceedings" (McAllister Decl. (Dkt. No. 47) ¶ 10), Petitioner has not explained what if any efforts it made to enforce the Award once the Indonesian courts began virtual proceedings, or why any such efforts would have been futile.

As to the timing of Petitioner's alleged visits to the South Jakarta District Court, the only precise information supplied by Petitioner relates to court visits in 2021. In Yamin's declaration, he states that he "went to the South Jakarta District Court to inquire about [his] application for an execution order[] on January 11, 2021," and that he made additional inquiries

11

about the execution order "[o]n February 4, 2021" and "[o]n Monday, February 22, 2021." (Yamin Decl. (Dkt. No 27) ¶¶ 15-16)[6]  Actions taken in 2021 cannot serve as a basis for equitable tolling, however, because the three-year statute of limitations expired on or about July 27, 2020.  See McGinnis, 208 F.3d at 17.

A petitioner seeking application of equitable tolling also must demonstrate that it was reasonably diligent in seeking to have the foreign arbitral award confirmed in the United States pursuant to the New York Convention and Section 207.  Petitioner has offered no explanation for why it did not file its Petition in this action until December 20, 2020, more than five months after the three-year statute of limitations had expired.

The Court concludes that Petitioner has not shown that it was "pursuing [its] rights diligently" throughout the three-year statutory period imposed by 9 U.S.C. § 207.  Menominee Indian Tribe, 577 U.S. at 255 (quotation marks and citation omitted).

Even if Petitioner had acted with reasonable diligence, equitable tolling would not be proper, because Petitioner has not shown that "some extraordinary circumstance stood in [its] way and prevented timely filing [of the Petition]."  Id. (quotation marks and citation omitted).

Petitioner claims that the "extraordinary circumstances" that prevented it from timely filing the Petition are (1) "the collusive acts of . . . Indonesian [s]tate [a]ctors[] that essentially blocked the doors to justice [in Indonesia]"[7]; and (2) Petitioner's involuntary

---

[6] Because the only precise dates offered by Petitioner are in 2021, it is possible that the "multiple visits" to the court referenced by Yamin all took place in 2021.

[7] In this regard, Petitioner represents that "on July 2, 2020, Indonesian police arrested and detained Roy Yamin," Petitioner's Director, "resulting in his eviction and seizure of critical personal and business documents."  (McAllister Decl. (Dkt. No. 47) ¶ 10)  Petitioner does not explain what bearing this arrest has on its filing of the Petition.  As an initial matter, by July 2, 2020, the three-year period for filing a petition to confirm the July 27, 2017 Award had nearly passed.  Moreover, acknowledging that certain of Yamin's "personal and business documents" were seized by the police, Petitioner has not explained why the seizure of these materials

12

bankruptcy in 2019, which it claims is part of the alleged collusion amongst Indonesian state actors. (Butler Ltr. (Dkt. No. 48) at 3)

As to the alleged collusion amongst Indonesian state actors, Petitioner's allegations are conclusory and speculative. Petitioner appears to suggest that Respondent (1) conspired with the South Jakarta District Court to delay issuing the execution order on the Award, which (2) caused Petitioner's default on its loans from Bank BJB, resulting in (3) Bank BJB's involuntary bankruptcy proceeding against Petitioner. According to Petitioner, all of this alleged conduct was designed to assist Respondent in avoiding its obligations under the Award. (See McAllister Decl. (Dkt. No. 47) ¶¶ 7-9, 11-12) But Petitioner has offered only speculation in support of its allegations of collusion. Petitioner has not proffered facts suggesting that Respondent orchestrated the delay in court action, or that Respondent instigated Bank BJB's involuntary bankruptcy filing.

Petitioner further contends that the involuntary bankruptcy proceeding "crippled" its ability to conduct business and "overwhelmed [Petitioner] with multiple litigations related to the involuntary bankruptcy." (Id. ¶ 9; Butler Ltr. (Dkt. No. 48) at 2) But Petitioner cites no case law suggesting that the difficulties arising from managing scarce "resources" (see Butler Ltr. (Dkt. No. 48) at 2), or the burdens associated with multiple litigations, constitute the type of "extraordinary circumstance" warranting application of equitable tolling. To the contrary, courts in this District have repeatedly held that a party's "limited financial means and inability to afford a lawyer are not 'extraordinary circumstances' that support equitably tolling the limitations

---

prevented it from filing the instant action. The only attachments to the Petition are the parties' arbitration agreement, the Award, and Petitioner's application for an execution order. (See Pet. (Dkt. No. 1), Exs. 1-5)) In sum, Petitioner has not demonstrated that Yamin's arrest constitutes an "extraordinary circumstance" that prevented it from initiating this action in a timely manner.

13

period." Wen Liu v. Mt. Sinai Sch. of Med., No. 09 Civ. 9663 (RJS), 2012 WL 4561003, at *5 (S.D.N.Y. Sept. 24, 2012) (citing Apionishev v. Columbia Univ., No. 09 Civ. 6471 (SAS), 2011 WL 1197637, at *6 (S.D.N.Y. Mar. 25, 2011); da Costa v. Union Loc. 306, No. 08 Civ. 2470 (PAC), 2009 WL 3076077, at *6 (S.D.N.Y. Sept. 25, 2009)).  And while Petitioner is a foreign entity that needed to retain U.S. counsel, courts have declined to apply equitable tolling simply because of the logistical difficulties associated with retaining counsel.  See, e.g., Lama v. Malik, 192 F. Supp. 3d 313, 318 (E.D.N.Y. 2016) (refusing to apply equitable tolling where plaintiff, a citizen of Nepal who alleged Fair Labor Standards Act and New York Labor Law claims, took no steps to retain a lawyer or to take advantage of "the resources of information and assistance to pursue her rights available to her"); Lindsey v. Punta Vista Bahia SA, No. CV-17-04596 (PHX) (JJT), 2018 WL 3012110, at *3-4 (D. Ariz. June 15, 2018) (holding that neither "[d]efendants' appeal of the arbitration award [that plaintiffs sought to enforce under the New York Convention] to the Costa Rica Supreme Court" nor plaintiffs' "failure to retain U.S. counsel" constituted extraordinary circumstances warranting equitable tolling).

BCB Holdings Ltd. v. Government of Belize, 110 F. Supp. 3d 233 (D.D.C. 2015), cited by Petitioner (see Butler Ltr. (Dkt. No. 48) at 3), is not to the contrary.  In that case, the court applied equitable tolling in an action brought to confirm a foreign arbitral award under the New York Convention.  The arbitration award had been issued in London.  BCB Holdings, 110 F. Supp. 3d at 238, 245.  After the award was issued, the Belize government enacted "criminal penalties in effect between 2010 and 2014 [that] subjected petitioners and their attorneys to the risk of imprisonment and a substantial fine if they attempted to enforce the [arbitration award] in this or any other jurisdiction."  Id. at 245.  The court held that these criminal penalties had a "'chilling effect' on seeking enforcement of the [arbitration award]" and that, accordingly, "the

14

period during which [petitioners] were barred from pursuing their rights while the 2010 criminal statute was in effect" was excluded under the doctrine of equitable tolling.  Id.

Here, Petitioner argues that the alleged collusion among agencies of the Indonesian government and the involuntary bankruptcy proceeding brought against Petitioner had a similar "chilling effect" on Petitioner's ability to pursue confirmation of the Award before this Court.  Indeed, Petitioner argues that the alleged collusion "had [an] effect on Petitioner tantamount to a mandatory injunction preventing Petitioner's timely filing."  (Butler Ltr. (Dkt. No. 48) at 3)

The scanty factual record proffered by Petitioner is not sufficient to support these claims.  As discussed above, Petitioner has presented no facts suggesting that collusion among Indonesian agencies actually took place, much less that Petitioner feared retribution if it commenced this action.  In short, the factual record here is not comparable to the criminal penalties faced by the petitioner in BCB Holdings.

The Court concludes that Petitioner has not demonstrated the type of "extraordinary circumstances" necessary to justify the application of equitable tolling.

Finally, even if Petitioner had alleged facts supporting its claims of collusion, Petitioner has not "demonstrate[d] a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of [its] filing." Hizbullahankhamon, 255 F.3d at 75 (quotation marks and citation omitted).  As described by Petitioner, its circumstances prior to the filing of the Petition and its circumstances today are largely the same.  Petitioner states that it "continues to challenge legal irregularities and conflicts of interest that threaten its remaining assets" in Indonesia (McAllister Decl. (Dkt. No. 47) ¶ 9), and that – because of the bankruptcy – Petitioner's "[c]ompany accounts were frozen on or

before November 27, 2019, and remain frozen today." (Butler Ltr. (Dkt. No. 48) at 2)  In short, Petitioner does not explain what changed between 2017 and December 2020 that permitted it to file the instant action in December 2020.  This lack of a causal connection between the alleged "extraordinary circumstances" and Petitioner's ability to file its Petition demonstrates that equitable tolling does not apply.  Indeed, the lack of a causal connection suggests that Petitioner's delay in filing the Petition is simply "garden variety . . . excusable neglect," rather than the result of "extraordinary circumstances."  Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990) ("[T]he principles of equitable tolling . . . do not extend to what is at best a garden variety claim of excusable neglect."); see also Viti v. Guardian Life Ins. Co. of Am., No. 10 Civ. 2908 (ALC) (MHD), 2013 WL 6500515, at *18 (S.D.N.Y. Dec. 11, 2013) ("The fact that plaintiff was later able to take measures to protect his legal rights despite suffering the same afflictions that he bore during the relevant period defeats his characterization of that period as extraordinary.").

## CONCLUSION

For the reasons stated above, this action will be dismissed as time-barred.  The Clerk of Court is directed to terminate the pending motions (Dkt. Nos. 7, 25) and to close this case.

Dated: New York, New York
       March 31, 2022

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge